


IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DIVISION OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| FREDERICK L. SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:08-cv-1349-TMP |
| | ) | |
| THE BOARD OF TRUSTEES OF THE UNIVERSITY OF ALABAMA, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION

This cause is before the court on the motion for summary judgment filed September 24, 2009, by the defendant, The Board of Trustees of the University of Alabama ("defendant"). Defendant seeks dismissal of all of plaintiff's claims. This matter has been fully briefed, and the court has considered the evidence and arguments set forth by both parties. The parties have consented to the exercise of jurisdiction by the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c); accordingly, the court submits this memorandum opinion.

## I. Summary Judgment Standards

Under Federal Rule of Civil Procedure 56(c)(2), summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex, 477 U.S. at 322-23. There is no

requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." Id. at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting former Fed. R. Civ. P. 56(e)). The current version of Rule 56 still requires that the nonmoving party "may not rely merely on allegations or denials in its own pleading; rather, its response must — by affidavits or as otherwise provided in this rule — set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The nonmoving party need not present evidence in a form necessary for admission at trial; however, she may not merely rest on her pleadings. Celotex, 477 U.S. at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983). However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must

"view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor. Anderson, 477 U.S. at 255. The non-movant need not be given the benefit of every inference but only of every reasonable inference. Brown v. City of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## II. Facts For Summary Judgment Purposes

For purposes of determining the defendant's motion for summary judgment, and applying the above stated standards for summary judgment, the following facts are undisputed or, if disputed, are taken in a light most favorable to the non-moving plaintiff:[1]

The plaintiff, Frederick L. Smith, is an African American male. (Complaint, 1). The defendant Board of Trustees of the University of Alabama governs and operates the University of Alabama at Birmingham ("UAB"), which is an institution of higher education and one component of the University of Alabama System.[2] UAB initially hired the plaintiff as a temporary service employee in April of 2005. (Plaintiff deposition, 21-22). Following the completion of his temporary service employment, the plaintiff was hired by the defendant in October of 2005 as a full-time equipment management technician. (Plaintiff deposition, 31, 37); (Defendant's Exhibit 2, 11, 12). Working in the warehouse at UAB, plaintiff's primary responsibility was to remove and erase data from computers being retired or replaced by UAB. (Elston Deposition, 50) He also was involved

[1] In his response in opposition to defendant's motion for summary judgment, the plaintiff accepts the statement of facts set forth in defendant's brief, and he has offered no evidence different than that offered by the defendant.. The plaintiff argues simply that these undisputed facts and the totality of the circumstances show that a hostile and intolerable work environment due to racial harassment by defendant and/or its agents existed as he has alleged. (Plaintiff's response in opposition to defendant's motion for summary judgment, 1-2).

[2] For the sake of convenience, the court will refer to the defendant as UAB, recognizing that UAB is simply part of the larger University of Alabama System.

in receiving equipment surplus and assisting with the surplus auctions. (Plaintiff deposition, 41-42); (Defendant's Exhibit 2 and 11). Although plaintiff was given a UAB employee badge with the label "manager" under his name, it is undisputed that he never managed people, only the equipment (Plaintiff deposition, 37-40) and that his official title and job description was that of equipment management technician.

Roger Nesmith , the Warehouse Supervisor, was the plaintiff's direct supervisor, and above him was Rita Elston, the Director of Equipment Accounting, and Michael Baxley, the Assistant Director of Equipment Accounting. (Plaintiff deposition, 43-44). In addition to Nesmith, Elston, and Baxley, plaintiff worked with Joel (or Joey) Richardson, who was plaintiff's co-worker, and who began working for the defendant before the plaintiff. (Plaintiff deposition, 46). Although Nesmith, Richardson, and plaintiff were physically located in the warehouse, Elston and Baxley had offices elsewhere on the UAB campus. During plaintiff's employment, however, Elston instituted a weekly meeting of all warehouse-related employees, including herself and Baxley, each Thursday.

Beginning in late 2005 or early 2006, plaintiff began to voice his concerns to his direct supervisor, Nesmith, that he needed help in the warehouse because Richardson was not doing his job. (Plaintiff deposition, 54). He complained that while he performed both his and Richardson's jobs, Richardson would spend hours downloading and mixing music from the internet. Because he was not satisfied with Nesmith's response to his complaint, plaintiff decided to meet with Elston,[3] but only after notifying Nesmith of the problem and waiting for Nesmith to change Richardson's work behavior. (Plaintiff deposition, 54-55).

In his first meeting with Elson, who also is African-American, plaintiff discussed his dissatisfaction with Richardson's job performance and complained about having to do more work than Richardson. (Plaintiff deposition, 54-56). During this meeting, Elston instructed plaintiff to report his complaints to Nesmith because Nesmith was the warehouse supervisor and the person in charge of running the warehouse. (Plaintiff deposition, 57). However, plaintiff did not trust

[3] Elston is an African American woman, who used to hold Nesmith's job. However, she was promoted to Director of Equipment Accounting before the plaintiff was hired. Plaintiff felt that he could trust Elston because she was an African American. (Elston deposition, 7).

Nesmith, and decided to have three or four more meetings with Elston concerning his treatment in the warehouse. (Plaintiff deposition, 57-58).

In June of 2006, plaintiff complained that he was not allowed to use the forklift in the warehouse. Mike Baxley consulted with Robert Barnes, an employee in UAB's Human Resources Management office. Plaintiff also met with Barnes to complain about his working conditions. (Plaintiff deposition, 58). In his initial meeting with Barnes in June of 2006, plaintiff primarily complained about not being allowed to use the forklift when Nesmith and Richardson were allowed to do so, and about other employees being allowed to bid on surplus auction items before the auction began. (Barnes, 13-14). The plaintiff also complained that Richardson was not doing his share of the work and that other employees were altering his paperwork to make him look bad. (Barnes, 14-16). After meeting with the plaintiff, Barnes investigated these complaints. (Barnes, 15-16).

Baxley and Barnes investigated the complaint concerning the forklift, and determined that none of the warehouse employees was trained and certified to operate the forklift. Baxley had mistakenly believed that Nesmith and Richardson were trained and certified. They then suspended all use of the forklift until all three employees, Nesmith, Richardson, and plaintiff, were trained and certified to use the forklift. (Barnes deposition, 17) Thereafter, all three employees operated the forklift.

As a result of the forklift incident, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission in June 2006. Although UAB apparently received a copy or notice of the charge, it was not required to respond to it, and the EEOC took no action. There is no evidence in the record concerning the disposition of the charge, or whether plaintiff ever filed suit based on it.

Barnes also investigated the plaintiff's complaint concerning pre-auction bidding by other employees.[4] (Barnes deposition, 20). Barnes spoke with Baxley and Elston and determined that pre-auction bidding was not allowed. (Barnes deposition, 20). The plaintiff was unable to recall who was being allowed to bid on auction items before the auction and was unable to identify which

[4] This does not appear to be one of the bases for plaintiff's Title VII complaint. It certainly cannot be described as harassment for hostile work environment purposes, nor does he allege that he was discriminatorily denied the opportunity to bid as other employees were alleged to do.

warehouse items were purchased before the auction. (Barnes deposition, 19-20). After asking the plaintiff for specific instances of pre-auction bidding by other employees and discussing plaintiff's complaint with Baxley and Elston, Barnes concluded that no one was aware of any specific instances of pre-auction bidding. (Barnes deposition, 19-20).

Third, the plaintiff complained about having to do all of the work in the warehouse. (Barnes deposition, 23). Specifically, when Richardson was not doing his job, the plaintiff was asked to help out with general duties in the warehouse in addition to his primary job responsibilities. (Plaintiff deposition, 52); (Barnes deposition, 23). Occasionally, when Richardson was not doing his job, plaintiff had to complete Richardson's job responsibilities as well as his own duties. (Plaintiff deposition, 52). The plaintiff complained to Barnes, Elston, and Nesmith about having to do all of the work in the warehouse. Upon questioning by Elston, plaintiff was unable to identify any specific instances where he was required to perform extra work, or work overtime or through lunch, due to performing Richardson's work. (Elston deposition, 16-18). Plaintiff was not satisfied with the results of Barnes' investigation because he believed that Richardson should be terminated for not doing his work and Nesmith should be disciplined for not requiring Richardson to complete his own job responsibilities. (Plaintiff deposition, 91). Thus, after complaining to his superiors, plaintiff was still required to perform two jobs, while Richardson played on the computer. (Plaintiff deposition, 52).

Fourth, the plaintiff complained that his paperwork was being mixed up and altered. (Plaintiff deposition 75-76). The plaintiff's supervisor, Nesmith, would add items to and sign the plaintiff's paperwork without his knowledge. (Plaintiff deposition 101-02). When Nesmith would alter or change the plaintiff's paperwork, it made the plaintiff feel incompetent and worry that the changes might get him fired. (Plaintiff deposition, 103). Elston examined some paperwork that plaintiff produced as examples of the alterations, but she was unable to find any problems with the paperwork. (Elston deposition, 32-34). Plaintiff was not fired and never received a reprimand or other discipline for poor paperwork. (Plaintiff deposition, 103, 110). In fact, the plaintiff was never disciplined for poor work performance in any area of his job by the defendant or any of its employees. (Plaintiff deposition, 110).

On August 3, 2006, during or after one of the regular Thursday meetings of warehouse personnel, a confrontation occurred between plaintiff and Richardson. Present were plaintiff, Richardson, Nesmith, and Baxley. Elston was on vacation, and not present. Richardson angrily called plaintiff an "asshole" and said, "we're going to go at it." (Plaintiff deposition, 70); (Elston deposition, 20). The plaintiff understood Richardson's statement to be a threat, but he did not report the incident. (Plaintiff deposition, 82-84; Barnes deposition 36-37). Baxley overheard the confrontation and reported the incident to Elston and Barnes. Barnes suspended Richardson immediately until Elston could return from vacation and the matter could be fully investigated. (Elston deposition, 20). Elston, Barnes, and Richardson met in Barnes' office to discuss the incident and the inappropriateness of the comment. (Elston deposition, 22). Elston decided to give Richardson a three-day suspension without pay, a written warning, and ninety (90) days of probation. (Elston deposition, 23). Richardson filed a grievance over the discipline, and received a hearing before a grievance panel of UAB employees, at which he, Nesmith, and plaintiff testified. The grievance panel upheld the three-day suspension, but reduced the probation to 30 days. Richardson then appealed the grievance decision to the university president, Carole Garrison, who reduced the disciplinary action to a one-day suspension with thirty (30) days probation. (Barnes deposition, 34-35). Thereafter, Richardson never said anything else inappropriate to the plaintiff. (Plaintiff deposition, 82).

In October of 2006, plaintiff observed a urine-like substance[5] on the floor outside his office door. (Plaintiff deposition, 72). This occurred several more times, although plaintiff never personally saw anyone urinating in front of his office door. He did not report the incident to Elston until two or three weeks after it first occurred. (Plaintiff deposition, 72). Immediately, Elston reported the incident, and the substance was cleaned up. (Plaintiff deposition, 72). UAB police came to the warehouse to set up surveillance cameras, but were unable to locate a hiding place for

[5] The court uses the term "urine-like" substance because there is some uncertainty as to what the substance was. Although Elston and plaintiff testified that it looked and smelled like urine, Baxley expressed the belief that it was drainage from a refrigerator in the warehouse. Everyone agrees that the substances was cleaned up and it was never determined for sure that it was urine.

a camera. (Plaintiff deposition, 74). After the plaintiff's report to Elston, the urine incidents stopped immediately. (Plaintiff deposition, 75); (Barnes deposition 50-51).

On May 28, 2007, plaintiff submitted a letter of resignation to Elston, resigning his position "d[ue] to medical reasons related to repeated stressful situations." The resignation was triggered when plaintiff discovered that a stack of surplus equipment had been put on the warehouse elevator and sent to him near the end of his shift. He regarded this as another act of harassment.

After he resigned, the plaintiff complained in a letter to UAB president Garrison that an unidentified individual or group of individuals had cut holes in his work gloves during the time he worked in the warehouse. (Plaintiff deposition, 147). The plaintiff failed to notify any of his supervisors about the problem before he voluntarily resigned. (Plaintiff deposition, 148). Moreover, the defendant was unaware of the problem while the plaintiff was working in the warehouse. (Plaintiff deposition, 147-148). Gloves were not required for the work plaintiff performed on computers, but he was reimbursed for the gloves he purchased for himself. (Barnes deposition, 55-56).

Lastly, again in the August 2007 letter to President Garrison, plaintiff complained about an email that was sent to him and other employees in March or April 2007, which the plaintiff viewed as discriminatory and derogatory. (Plaintiff complaint). Specifically, Nesmith sent the email, which discussed the "Rules of the South," which offended plaintiff. (Elston deposition, 43). After Elston was notified of the email and its contents, Elston spoke with Nesmith about not sending out emails that were unrelated to work. (Elston deposition, 44). After the verbal warning, Nesmith did not send any more emails that were unrelated to work, and the plaintiff had no more complaints about work emails being derogatory or discriminatory. (Elston deposition, 44).

Plaintiff was never subjected to any disciplinary action while working for the defendant. (Plaintiff deposition, 110). In addition, Plaintiff was aware that the defendant had a written policy that prohibited discrimination based on race (Plaintiff deposition, 110).[6]

---

[6] Neither party has put a copy of the policy into evidence.

## III. Discussion

Defendant seeks summary adjudication of all of plaintiff's claims. Defendant asserts that plaintiff failed to prove a *prima facie* claim of hostile work environment based on racial discrimination or constructive discharge, and that, even if the *prima facie* showing were made, plaintiff failed to overcome the defendant's defense that it acted reasonably by having a policy against racial discrimination and by following that policy to address the plaintiff's complaints.

The plaintiff claims that he was discriminated against on the basis of his race, which created a hostile work environment and resulted in his constructive discharge.[7] Plaintiff contends that a hostile work environment was created and caused his constructive discharge by the following incidents:

(1) Plaintiff was not allowed to use the forklift in the warehouse to move equipment when he was not certified to use the equipment, but Nesmith and Richardson, who were white employees, were allowed to use the forklift despite not being certified. (Plaintiff deposition, 49-51).

(2) Plaintiff had to complete his job duties as well as Richardson's job duties. (Plaintiff deposition, 52).

(3) The plaintiff's paperwork was altered to make him look incompetent. (Plaintiff deposition, 51).

(4) Other employees urinated in front of plaintiff's office door. (Plaintiff deposition, 51).

(5) Plaintiff was called an asshole and threatened by co-worker, Richardson. (Plaintiff deposition, 69-70).

---

[7] While not clear from the complaint, it appears that plaintiff's only Title VII employment discrimination claim relates to the allegation of a hostile work environment that resulted in his constructive discharge. Other than the alleged constructive discharge, there is no allegation of any tangible adverse employment action being taken against him by UAB. He does not allege any facts indicating that he was denied advancement, demoted, disciplined, or otherwise adversely treated in any specific employment decision, much less that such action was taken in a discriminatory manner.

(6) An unknown employee or employees put holes in plaintiff's work gloves. (Plaintiff deposition, 148, 150).

(7) Plaintiff's supervisor, Nesmith, sent a racially derogatory email concerning the "Rules of the South" to plaintiff. (Elston deposition, 43)

A. Racial Discrimination

The plaintiff asserts that he is entitled to relief under Title VII because he was subjected to a hostile work environment based on race. Defendant UAB contends that the plaintiff has not met his burden of coming forward with sufficient evidence to present a *prima facie* case. In order to prove a *prima facie* case, the plaintiff must demonstrate that his workplace was permeated with discriminatory behavior that was sufficiently severe or pervasive to create a hostile or abusive working environment. Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993). As the court of appeals has explained:

> This court has repeatedly instructed that a plaintiff wishing to establish a hostile work environment claim show: (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as [race]; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002), citing Mendoza v. Borden, Inc., 195 F.3d 1238, 1244 (11th Cir. 1999); see also McCann v. Tillman, 526 F.3d 1370, 1373 (11th Cir. 2008). To be actionable, the environment must be both objectively and subjectively hostile, and whether the workplace may be deemed hostile "can be determined only by looking at all the circumstances." Id. at 23. Whether racially hostile events and actions are sufficiently "severe and

pervasive" requires assessment of such factors as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993).

It has been noted that Title VII may not be used as a tool to remedy "the ordinary tribulations of the workplace," Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998), or the failure of supervisors and coworkers to treat an employee with "sensitivity, tact and delicacy," Minor v. Ivy Tech State College, 174 F.3d 855, 858 (7th Cir. 1999). Moreover, the court is not permitted to police language in the workplace under the guise of enforcing Title VII. Title VII is not a "general civility code." Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 81, 118 S. Ct. 998, 1002, 140 L. Ed. 2d 201 (1998).

The plaintiff sets forth several events and circumstances that indicate that the warehouse was not an easy place for the plaintiff to work, that the warehouse duties were not always equally distributed, that the warehouse was not always clean and well-organized, and that inappropriate and offensive language occasionally was used. Also, the plaintiff has shown that there was a time-period when he was not allowed to use equipment that his white co-workers were allowed to use. The defendant contends, however, that the conditions in the warehouse did not subject the plaintiff to harassment and abuse so severe or pervasive to constitute race discrimination under Eleventh Circuit Court of Appeals precedent. The court agrees.

First, it is not at all clear that many of the things complained of by plaintiff were racially motivated. The third element of a *prima facie* showing on a claim of hostile work environment is that the victim was chosen for harassment *because* of his protected-class status, that is, because of

his race. Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002). To make a *prima facie* showing, and thereby avoid summary judgment, a plaintiff claiming a racially hostile work environment must present substantial evidence that the harassment was motivated by racial animus. Harassment due to simple personal dislike, unrelated to any protected characteristic, is not actionable under Title VII. See McCollum v. Bolger, 794 F.2d 602, 610 (11th Cir. 1986)("Personal animosity is not the equivalent of ...discrimination and is not proscribed by Title VII. The plaintiff cannot turn a personal feud into a ...discrimination case by accusation." (Footnote omitted)); Pipkins v. City of Temple Terrace, Fla., 267 F.3d 1197 (11th Cir. 2001).

Except for the allegedly racially insensitive email sent by Nesmith and the time that plaintiff was not allowed to use the forklift while the white employees did, none of the other events mentioned is overtly racial in character or necessarily evidence of racial animus. Even Richardson's comments that plaintiff was an "asshole" and that "we're going to go at it," do not establish inherently that they were made *because* plaintiff is African-American.[8] Requiring plaintiff to perform another employee's duties, putting holes in his work gloves, and altering his paperwork do not establish that these events occurred because of plaintiff's race. Furthermore, there is no reason to conclude that the employer, UAB, condoned the actions, even if they were racially motivated. The

---

[8] Plaintiff points out that the events he complains of happened to *him*, an African-American, and, therefore, must be racially motivated. This argument, however, conflates the first and third elements of the claim. Being of a particular race may meet the first element, but it does not necessarily show that race was the *cause* of the animus. There must be something more that suggests the nature of the underlying motivation. For example, in sexual discrimination cases, the acts of harassment typically involve conduct that is inherently demeaning to women as a class, and from this it can be inferred that sex is the motivating characteristic. The same is frequently true in race discrimination cases. In this case, however, except for the two events noted, the actions complained of are not inherently racist or demeaning to African-Americans as a class. It can be argued reasonably that these acts were intended to demean the plaintiff, but that says nothing more than there was *personal* animosity involved, not racial.

UAB employee most directly responsible for the supervision of all warehouse employees, Elston, is herself African-American. It is not only unlikely that her subordinate employees, being under her supervision, would engage in racial harassment, but also even less likely that she would tolerate it. Although plaintiff speculates about the animus behind the events, his "speculation" simply is not enough to support a hostile work environment claim. See Edwards v. Wallace Community College, 49 F.3d 1517, 1522 (11th Cir. 1995). It cannot be *reasonably* inferred that there was a racial animus; neither the nature of the acts nor any other evidence allows the court to do anything more than speculate about the underlying animus. In sum, it is not clear that the events described by plaintiff occurred *because* of his race, as required by the third element of a *prima facie* showing of a racially hostile work environment.

Additionally, the events described, even if racially motivated, were not sufficiently severe or pervasive as to alter the terms and conditions of plaintiff's employment. The frequency of the conduct does not compel a conclusion that plaintiff was subjected to a hostile environment. Even giving plaintiff the benefit of events he did not complain about until *after* he resigned, over the year and a half that he worked in the warehouse he was exposed to one racially insensitive email, one angry remark by a co-worker, one instance of finding holes in his work gloves, several instances of finding a urine-like substance outside his office door, and the temporary denial of the use of a forklift. Plaintiff was not exposed to an almost-constant barrage of threats or humiliation, as he implies. This smattering of unpleasant events was not so frequent that it adversely impacted plaintiff's ability to perform his work.

Not only was the conduct complained of not pervasive, the identified conduct also was not severe enough to make a *prima facie* case. Keeping in mind that Title VII is not designed to remedy

ordinary workplace tribulations, most of the events described simply were not threatening or humiliating. Although Nesmith sent plaintiff an email about the "Rules of the South," which plaintiff found racially insensitive, he has not proven the contents of the email, and the court has no way of assessing whether it was threatening, humiliating, or merely in bad taste. It appears that the remarks by Richardson were not seen by the plaintiff as so threatening that he should report them, because he did not report them to Elston, as he was accustomed to doing. Finding urine outside his office door on several occasions certainly was offensive, but it is not clear how it was either threatening or humiliating to him. None of these events threatened direct harm to the plaintiff or subjected him to open ridicule or embarrassment in the workplace, with the exception of Richardson's single confrontation with plaintiff. Although Richardson's comments were insulting and threatening, they were not so threatening as to create a hostile environment all by themselves.

______The conduct complained of also must be viewed in the overall context of plaintiff's employment. After making his complaints, plaintiff was trained, certified, and allowed to use the forklift in the warehouse. After Baxley and Barnes discovered that the white employees were not certified, the white employees were not allowed to use the forklift until they received certification as well. The urine found in front of plaintiff's office door was cleaned up, and it never appeared again in front of plaintiff's office door after it was reported and investigated by Elston and the UAB police. The plaintiff was never reprimanded or criticized for poor paperwork, despite his personal fears of getting in trouble for poor paperwork. The plaintiff never complained of having to stay late, work overtime, or work without pay in order to perform his job responsibilities as well as to perform Richardson's job responsibilities. The plaintiff did not complain to anyone about Richardson calling him an "asshole" or threatening him by saying "we're going to go at it." In fact, Baxley reported the

incident, and Richardson was suspended immediately and never cursed or threatened plaintiff again. The plaintiff only received one insensitive email, and Nesmith was reprimanded immediately for sending it, and it never occurred again. Lastly, plaintiff failed to complain to any of his supervisors about his work gloves having holes in them until after he resigned his employment.

The final factor the court must examine is whether the offensive conduct unreasonably interfered with plaintiff's work performance. In this case, plaintiff concedes that he was never reprimanded, criticized, or subjected to any disciplinary action for poor work performance. The plaintiff made attempts to work with the other warehouse employees and not allow his complaints to interfere with his work performance. The plaintiff offered no substantial evidence indicating that the incidents he complained of interfered with his work performance. Consequently, plaintiff has failed to show the essential element of a hostile environment claim that the harassment was so severe and pervasive that it interfered with his work..

Accordingly, the court finds that the conduct described by plaintiff did not rise to the level of an actionable hostile environment. Even taking the evidence most favorably for the plaintiff, he has failed to demonstrate that the conduct was sufficiently extreme or "severe and pervasive" as to support a Title VII claim. What plaintiff describes is ordinary tribulations in the workplace: miscommunication and misunderstandings between employees and supervisors, personal animosity, unclean work spaces, and occasional rude treatment. While such conduct is not to be condoned, it is not enough to be race discrimination actionable under Title VII, and the defendant's motion for summary judgment as to the hostile environment claims set forth by plaintiff is due to be granted.

B. Hostile Environment Affirmative Defense

UAB also asserts in its summary judgment motion that it has a valid affirmative defense to liability for plaintiff's hostile environment claim. The defendant contends that, even if the court found that plaintiff was subjected to a hostile work environment, the defendant should not be held liable when it exercised reasonable care to prevent and correct promptly any harassment and when the plaintiff failed to take advantage of any preventive or corrective opportunities provided by it or to avoid harm. But the court believes the evidence presented by UAB in support of its motion falls short on this ground.

Although it is undisputed by plaintiff that UAB had an anti-discrimination policy, neither the policy itself nor how it operated or was enforced has been included in the evidence before the court. An employer is liable vicariously to a plaintiff for a hostile environment created by any immediate supervisor or successively higher authority over the plaintiff. Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998). When the defendant has not taken any tangible employment action against the plaintiff, it may raise an affirmative defense to liability. Id. In order to prove the affirmative defense to a hostile environment claim, the defendant must establish that (a) it exercised reasonable care to prevent and correct promptly any harassing behavior, and (b) that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm. Id. First, proof that the defendant had a clearly stated anti-harassment policy with a complaint procedure and that the defendant exercised reasonable care to prevent and correct harassing behavior can satisfy the first element of the defense. See id. Second, proof that plaintiff failed to fulfill his corresponding obligation of reasonable care to avoid harm by showing that plaintiff unreasonably failed to use any complaint procedure provided by employer can establish the

second element of the defense. See id. However, this affirmative defense is not available to defendant when the supervisor's harassment results in a tangible employment action against plaintiff, such as discharge, demotion, or undesirable reassignment. Id.

First, plaintiff admits that defendant UAB had a clearly stated policy prohibiting workplace harassment. Plaintiff also acknowledges that his supervisors and management listened to and investigated his complaints, but he contends that defendant's investigation and resolution of his concerns were not adequate. Although it is true that there is no requirement that a plaintiff be satisfied with his employer's response to his complaints as long as the response was reasonable, Madray v. Publix Supermarkets, Inc., 208 F.3d 1290, 1302 (11th Cir. 2000), UAB has failed to provide the court with substantial evidence about its policy and how the complaint resolution procedure worked. UAB has the burden of proof on this affirmative defense, and on the basis of the evidence before the court, it cannot be said as a matter of law that UAB's anti-discrimination policy was robust or well communicated to employees, or whether it provided effective remedies for discrimination. Absent this evidence, UAB has not shown, at least at this stage, its entitlement to summary disposition on the basis of this defense.

C. Constructive Discharge

The defendant contends that plaintiff failed to prove the *prima facie* elements for a constructive discharge claim. Plaintiff argues that the facts of record prove that the harassment he suffered based on his race was so intolerable that a reasonable person in his position would have resigned and that the harassment resulted in his constructive discharge. For plaintiff to have been constructively discharged, his voluntary resignation must have been in order to escape intolerable

and illegal employment requirements to which he was subjected because of his race. Morgan v. Ford, 6 F.3d 750, 755 (11th Cir. 1993) (quoting Henson v. City of Dundee, 682 F.2d 897, 907 (11th Cir. 1982) (citation omitted). The plaintiff is required to prove that his working conditions were so intolerable that a reasonable person in his position would have been compelled to resign. Id. (citing Steele v. Offshore Shipbuilding, Inc., 867 F.2d 1311, 1317 (11th Cir. 1989)) (citations omitted).

As previously noted, plaintiff did not suffer from an actionable hostile environment. "The standard for proving constructive discharge is higher than the standard for proving a hostile work environment." Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1231 (11th Cir. 2001) (citing Landgraf v. USI Film Prods., 968 F.2d 427, 430 (5th Cir. 1992) ("To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile work environment.")) (citations omitted). To prove constructive discharge, the plaintiff is required to present evidence that the harassment was so pervasive and severe that a reasonable person would have been compelled to resign. The plaintiff failed to meet his burden. Thus, the defendant's motion for summary judgment as to plaintiff's constructive discharge claim is due to be granted.

D. Retaliation

Plaintiff also seems to suggest that UAB retaliated against him for filing his June 2006 EEOC charge and for complaining about the allegedly racially hostile work environment. To prove a Title VII retaliation claim, the plaintiff must come forward with substantial evidence of three elements:

> To establish a prima facie case of retaliation under Title VII, a plaintiff must prove the following elements: (1) she participated in an activity protected by Title VII; (2) she suffered an adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse employment decision. See Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 587 (11th Cir. 2000). Statutorily protected expression includes internal complaints of [racial] harassment to superiors as well as complaints lodged with the EEOC....

Pipkins v. City of Temple Terrace, Fla., 267 F.3d 1197, 1201 (11th Cir. 2001). An "adverse employment action" is any action by the employer that might deter a reasonable employee from complaining about illegal discrimination. See Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 71, 126 S. Ct. 2405 (2006).

In this case, plaintiff has pointed to no adverse action taken by UAB against him during his employment. He was not denied advancement, was not demoted, was not disciplined, and was not reassigned from the job he was hired for. Plaintiff simply cannot establish that UAB engaged in any retaliatory action. Although he complains about the conduct of his co-worker (Richardson) and his direct supervisor (Nesmith), he points to no evidence that either of these employees were aware of his EEOC charge in 2006. There is no evidence that any UAB supervisory employee who was aware of plaintiff's complaints ever took any adverse action against him. Indeed, the evidence appears to be that every complaint was thoroughly investigated, with several of them resulting in remedial action being taken favorably to plaintiff.

Thus, plaintiff cannot establish an essential element of his claim for retaliation. He cannot show that he suffered any adverse action, retaliatory or otherwise, by UAB. To the extent plaintiff has attempted to plead a retaliation claim, defendant is entitled to summary judgment dismissing it.

IV. Conclusion

Accordingly, consistent with the foregoing discussion of the evidence presented and the law governing this action, this court determines that defendant's motion for summary judgment against plaintiff (court document # 28) is due to be GRANTED, and all of plaintiff's claims are due to be DISMISSED WITH PREJUDICE.

A separate order will be entered in accordance with the findings set forth herein.

DATED this 11th day of June, 2010.

T. MICHAEL PUTNAM
U.S. MAGISTRATE JUDGE